IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.   11-cv-02801-WYD-CBS

CARL BUCK,

      Plaintiff,

v.

CF&I STEEL, L.P.,

      Defendant.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

    THIS MATTER is before the Court on Defendant's Motion for Summary

Judgment (ECF No. 26), filed August 10, 2012.  Defendant CF&I Steel, L.P., d/b/a

Evraz Rocky Mountain Steel ("Evraz") seeks summary judgment on Plaintiff's hybrid

claim brought under Section 301 of the Labor Management Relations Act ("LMRA")

alleging that Evraz improperly discharged Plaintiff in violation of the Collective

Bargaining Agreement ("CBA") and that Plaintiff's Union ("the Union") failed to fairly

represent Plaintiff during the grievance process related to his discharge.  For the

reasons stated below, I find that Plaintiff has failed to raise a genuine issue of fact as to

whether the Union breached its duty of fair representation, a necessary element of

Plaintiff's claim.  Accordingly, Defendant's Motion for Summary Judgment is granted.

II.    <u>RELEVANT FACTUAL BACKGROUND</u>

    Plaintiff was employed at Evraz's plant under a Union collective bargaining

agreement.  Evraz provisionally discharged Plaintiff for allegedly violating the CBA drug policy by submitting an adulterated urine sample during a random drug test on December 7, 2010.  That test produced invalid results.  Plaintiff later tested positive for methamphetamine as part of a follow-up test administered on December 10, 2010. Evraz maintains that it terminated Plaintiff based entirely on its belief that Plaintiff submitted an adulterated sample for the December 7, 2010 test, rather than on his subsequent positive test results.  (ECF No. 27 at 5 ¶ 19.)

The parties do not appear to dispute that under the CBA, submitting an adulterated specimen constitutes grounds for immediate provisional discharge, whereas employees who test positive shall be given a last chance agreement.  Plaintiff denies submitting an adulterated sample and alleges that Evraz misconstrued his invalid drug test results as conclusive proof of adulteration and failed to properly investigate the results before taking disciplinary action.  In turn, Plaintiff claims that he should have received a last chance agreement based on his December 10, 2010 drug test, the results of which he does not dispute.

A.     Plaintiff's Drug Tests and Provisional Discharge

On December 7, 2010, Plaintiff and several other employees were directed to proceed to Evraz's "guard headquarters" where they were to provide urine samples for random drug tests.  (ECF No. 27 at 2-3 ¶ ¶8.)  Plaintiff attests that he was not wearing a coat and that he turned out his pockets prior to giving his sample to show an on-looking guard that they were empty.  (ECF No. 35 at 4 ¶ 44.)  Plaintiff also attests that the

sample he submitted was the proper temperature according to a temperature strip on the outside of the sample jar.  (ECF No. 35 at 4 ¶ 45.)

An outside agency analyzed Plaintiff's specimen and deemed his test results invalid.  (ECF No. 27 at 3 ¶ 11.)  The comments on the test results stated, "Abnormal Physical & Chemical Characteristics which may include one or more of the following: no uric acid, no urine odor, abnormal appearance, or no foaming." (ECF No. 32, Exhibit 7.)

Plaintiff was subjected to a second drug test on December 10, 2010 that came back positive for methamphetamine.  (ECF No. 27 at 4 ¶ 12, 5 ¶ 19.)  Plaintiff admits to using methamphetamine and does not dispute the results from his second test.  (ECF No. 1 at 2-3 ¶9; ECF No. 35, Exhibit 1 ¶¶ 7-9.)  Immediately after Plaintiff submitted his specimen for the second test, he received written notice that he was being provisionally discharged for "[s]ubmitting an adulterated sample. Refusal to cooperate regarding the collection of the sample."  (ECF No. 29, Exhibit 2.)

On December 23, 2010, the company notified Union President Mike Rodriguez via email that Plaintiff was being provisionally discharged.  (ECF No. 27 at 5 ¶ 16.) Under the CBA, a provisionally discharged employee has five days to request a hearing after which time the discharge becomes final.  (ECF No. 33 at 17.)  On December 27, 2010, Mr. Rodriguez left Plaintiff a voicemail message advising Plaintiff of procedures for requesting a hearing.  (ECF No. 27 at 5 ¶ 17.)  Plaintiff did not request a hearing within the five day deadline, and on December 29, 2010, the company notified the Union that it was finalizing Plaintiff's discharge.  (ECF No. 27 at 5 ¶ 17-18.)

The next day, Plaintiff contacted Mr. Rodriguez to request a hearing.  (ECF No. 27 at 5-6 ¶ 20.)  Mr. Rodriguez prepared a grievance and was able to schedule a Step 3 grievance hearing despite Plaintiff's untimeliness.  (ECF No. 27 at 6 ¶ 22.)

B.     The Step 3 Hearing and Follow-Up

Three Union representatives appeared on Plaintiff's behalf at the Step 3 hearing, which took place on January 11, 2011.  (ECF No. 27 at 6 ¶ 23.)  During the hearing, Evraz's Human Resources Director, Bob Schwetje, asked Plaintiff if he had adulterated his sample for the December 7, 2010 drug test.  (ECF No. 27 at 6 ¶ 23.)  According to Plaintiff, Mr. Schwetje became hostile during his examination of Plaintiff.  (ECF No. 35 at 2 ¶ 26.)  Plaintiff claims that he initially denied adulterating the sample but eventually said "sure whatever" in an effort to appease Mr. Schwetje who, at that point, was pointing and yelling at him from across a table.  (ECF No. 35 at 2 ¶ 26.)

Plaintiff's positive drug test was also discussed at the Step 3 hearing.  (ECF No. 27 at 7 ¶ 25.)  Plaintiff testified that he did not know traces of his drug use were still in his system at the time of the December 7, 2010 test and that he had not used drugs since the December 10, 2010 test was administered.  (ECF No. 27 at 7 ¶ 25.)  In addition, a Union representative argued that addictions were a sickness and, accordingly, that Plaintiff should be given a second chance.  (ECF No. 27 at 7 ¶ 25.)

Despite the Union's efforts, the grievance committee denied Plaintiff's grievance following the Step 3 hearing. (ECF No. 27 at 7 ¶ 27.)  The Union appealed, and a Step 4 hearing ultimately took place in late May 2011.  (ECF. No. 27 at 7 ¶ 27.)

Plaintiff alleges that in the interim Union representatives would not correspond with him regarding his grievance.  (ECF No. 35 at 2 ¶ 55.)  Plaintiff sent repeated emails in March 2011 to Mr. Rodriguez and Doug Fennel, a Union representative assigned to Plaintiff's case, in which he requested status updates on his grievance and argued the merits of his case.  (ECF No. 30, Exhibit 4, 5.)  Plaintiff alleged that he had been treated differently than another Union employee who had also received invalid results from a random drug test, but who allegedly had gone unpunished after passing a follow-up test.  (ECF No. 30, Exhibit 4, 5.)  Plaintiff alleged that had he received the same treatment, his invalid results would have not been counted against him and that, instead, he would have received a last chance agreement based on his positive results from the December 10, 2010 test.  (ECF No. 30, Exhibit 4, 5.)  Plaintiff now alleges that the other employee's name is Ryan Ehrlich but has not produced evidence supporting his allegations about Mr. Ehrlich.  (ECF No. 35 at 7-8 ¶¶ 59, 60.)

Mr. Fennell responded to Plaintiff's emails on March 29, 2011 instructing Plaintiff to "quite [sic] calling everyone[;] as I told you[,] I'm working on your case."  (ECF No. 30, Exhibit 6.)  In early May 2011, Plaintiff sent an email to another Union representative titled "failure to fairly represent fired without just cause," in which he alleged that the Union had failed to fairly represent him by refusing to update him on the status of his grievance.  (ECF No. 31, Exhibit 1.)

Beginning on May 21, 2011, Mr. Fennel sent several emails to Plaintiff notifying him that his Step 4 hearing was scheduled for the week of May 31, 2011 and instructing

him to send any information that might be relevant to his grievance.  (ECF No. 31,

Exhibit 2, 3, 5.)  Even though Plaintiff was not permitted to attend the hearing, which

was limited to Union and management officials, Mr. Fennel and Mr. Rodriguez met with

Plaintiff the morning of the hearing.  (ECF No. 28, Exhibit 1, at 20, 96:12-99:9; ECF No.

33 at 13.)  Plaintiff has testified that at the pre-hearing meeting, he "argued [his] case

with [Mr. Fennel and Mr. Rodriguez] and showed them everything that [he] thought was

relevant."  (ECF No. 28, Exhibit 1, at 20, 97:7-9.)

      C.    <u>The Step 4 Hearing and Union's Withdrawal of Plaintiff's Grievance</u>

Four Union representatives, including Mr. Fennel and Mr. Rodriguez, appeared

on Plaintiff's behalf at the Step 4 hearing.  (ECF No. 27 at 9 ¶ 34.)  Mr. Fennel argued

that Plaintiff's December 7, 2010 test results did not list any chemical agents that

adulterated the specimen.  (ECF No. 27 at 9 ¶ 34.)  Mr. Fennel also argued that invalid

test results do not imply that the test subject submitted an adulterated specimen.  (ECF

No. 27 at 9 ¶ 34.)

In response, Evraz's Manager of Labor Relations, Nikki Hansen, argued that the

possible physical and chemical characteristics listed on Plaintiff's December 7, 2010

test results suggested that the specimen Plaintiff submitted was not human urine.  (ECF

No. 27 at 9 ¶ 34.)  Ms. Hansen explained that absence of uric acid or urine odor,

abnormal appearance, and lack of foaming were all factors believed to suggest that the

specimen was not human urine.  (ECF No. 27 at 9 ¶ 34.)  In addition, Mr. Shwetje also

argued that Plaintiff had admitted at the Step 3 hearing to adulterating his December 7,

2010 sample.  (ECF No. 27 at 9 ¶ 34.)

Following the Step 4 hearing, Ms. Hansen notified the Union that the Company had affirmed its prior decision to deny Plaintiff's grievance.  (ECF No. 27 at 9 ¶ 35.) Over the coming month, Plaintiff sent several emails urging Mr. Fennel to pursue arbitration.  (ECF No. 32, Exhibit 2, 3.)  In these emails, Plaintiff notified Mr. Fennel that Mr. Rodriguez had said that the Union would pursue arbitration.  (ECF No. 32, Exhibit 2, 3.)  However, Mr. Fennel responded that he was responsible for making that decision and that he had not yet made up his mind.  (ECF No. 32, Exhibit 2.)  Plaintiff now claims that he told union officials that he would pay for the arbitration process himself.  (ECF No. 35, Exhibit 1 at 4 ¶ 17.)

After Mr. Fennel again met with the Company to discuss Plaintiff's grievance in July 2011, the Union withdrew Plaintiff's grievance without consulting Plaintiff further. (ECF No. 35, Exhibit 1 at 4 ¶ 17.)  This lawsuit followed.

III.     ANALYSIS

A.     Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

When applying this standard, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Telephone Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

The moving party holds the initial burden of establishing an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). The moving party need not negate a non-moving party's claim; rather, the moving party need only show a lack of evidence supporting a crucial element of a non-moving party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986)).

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to establish that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). To satisfy this burden, the non-moving party may not rely solely on the pleadings. *Id.* Rather, the non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671.

> B. <u>Whether Summary Judgment is Proper on Plaintiff's Hybrid Claim Under the LMRA</u>

Defendant argues that Plaintiff's claim should be summarily dismissed because

he has failed to establish that the Union breached its duty of fair representation in pursuing his grievance and, in any event, has failed to prove that Evraz breached the CBA.  I find that Plaintiff has failed to present sufficient evidence to satisfy the breach element of his claim and, accordingly, grant Evraz's Motion for Summary Judgment.

Pursuant to federal policy favoring private adjudication of labor disputes, courts ordinarily will not disturb the finality of a decision that is reached pursuant to procedures provided by a labor contract as to a union employee's grievance.  *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-64 (1983).  However, there is an exception to this finality rule where the union representing the employee breaches its duty of fair representation.  *Id.* at 164.  Under those circumstances, the employee may bring a hybrid claim under section 301 of the LMRA against both the employer and the union notwithstanding the outcome of the grievance process.  *Id.*

In order to preserve the deference owed to the grievance process, it is not sufficient for a plaintiff bringing a hybrid §301/fair representation claim to prove that the underlying grievance was meritorious.  *See General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963).  Rather, a hybrid claim necessarily entails two separate causes of action and requires a grieved employee to prove: "(1) Some conduct by the worker's union that breached the duty of fair representation; (2) A causal connection showing that the union's breach affected the integrity of the arbitration process, and; (3) A violation of the collective bargaining agreement by the company."  *Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1239

(10th Cir. 1998).  A plaintiff must show that the union breached its duty of fair representation even if it chooses not to sue the union but rather only the employer, as Plaintiff has done here.  *Thompson v. Aluminum Co. of America*, 276 F.3d 651, 656-57 (4th Cir. 2002).

1.   Breach of the Union's Duty of Fair Representation

Plaintiff's central claim is that the Union breached its duty of fair representation in arbitrarily refusing to arbitrate his grievance.  Plaintiff also claims that the Union processed his claim in a perfunctory fashion.

"Any substantive examination of a union's performance 'must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities.'"  *Lampkin v. Local No. 1093, UAW*, 154 F.3d 1136, 1144 (10th Cir. 1998) (quoting *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78, 111 S. Ct. 1127, 1135, 113 L. Ed. 2d 51 (1991)).  Under this standard, union employees do not have the absolute right to have their grievances taken to arbitration. *Vaca v. Sipes*, 386 U.S. 171, 191-92, 87 S. Ct. 903, 917-18, 17 L. Ed. 2d 842 (1967); *Chernak v. Southwest Airlines Co.*, 778 F.2d 578, 581 (10th Cir. 1985).  A union will be held to have breached its duty of fair representation only where it engages in "arbitrary, discriminatory, bad faith, or perfunctory conduct" towards one of its members.  *Webb*, 155 F.3d at 1239.

A union's conduct is not arbitrary unless it is "so far outside [the] 'wide range of reasonableness' [accorded union representatives] as to be irrational."  *Young v. UAW-*

-10-

*LETC*, 95 F.3d 992, 998 (10th Cir. 1996) (quoting *O'neill*, 499 U.S. at 67).  It is not sufficient for a plaintiff to show that the union committed "mere negligent conduct; carelessness or honest mistakes" as these are not sufficient to impose liability on a union.  *Webb*, 155 F.3d at 1240.  Rather, a plaintiff must show that the union "arbitrarily ignor[ed] a meritorious grievance or process[ed] it in perfunctory fashion."[1]  *Id.* at 1239 (quoting *Vaca*, 386 U.S. at 191).  A Union processes a grievance in a perfunctory fashion if it "act[s] without concern or solicitude, or g[ives] a claim only cursory attention."  *Webb*, 155 F.3d at 1240 (quoting *Beavers v. United Paperworkers Int'l Union, Local 1741*, 72 F.3d 97, 100 (8th Cir. 1995)).

### a.  Plaintiff's Claim that the Union Arbitrarily Refused to Arbitrate His Grievance

Plaintiff argues that his grievance would have likely succeeded at arbitration and that since he offered to pay the costs thereof, the Union's refusal to arbitrate was arbitrary.  However, Plaintiff cannot succeed on his hybrid claim simply by proving that his grievance was meritorious.  *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 571, 96 S. Ct. 1048, 1059, 47 L. Ed. 2d 231 (1976) ("[Plaintiffs] are not entitled to relitigate their discharge merely because they offer newly discovered evidence that the charges against them were false and that in fact they were fired without cause.  The grievance processes cannot be expected to be error-free.").  The Union is owed great deference in its processing of an employee's grievance, and Plaintiff was not entitled to

---

[1]The Tenth Circuit has held that under *Webb*, perfunctory union conduct may be actionable "in certain context or as a specific type of arbitrary conduct."  *Schwartz v. Brotherhood of Maintenance of Way Employees*, 264 F.3d 1181, 1185 (10th Cir. 2001) (citing *Webb*, 155 F.3d at 1240-41).  This distinction is insignificant here, as Plaintiff has failed to present sufficient evidence of perfunctory Union conduct.

obfuscate the Union's authority and compel arbitration by offering to pay the costs associated therewith.  Instead, to show that the Union's refusal to arbitrate was arbitrary, Plaintiff must show that his claim was so strong that the Union's decision was irrational.

Plaintiff has not satisfied his burden under this standard.  Plaintiff argues that his grievance would have likely succeeded at arbitration based on: (1) Evraz's allegedly disparate treatment of Mr. Ehrlich, the employee who allegedly received invalid test results but who was allowed to continue working after a follow-up test was negative; (2) Evraz's failure to investigate Plaintiff's invalid test results; and (3) Evraz's inability to prove that Plaintiff committed misconduct based solely on his December 7, 2010 test results.

Regarding Plaintiff's first contention, it is questionable whether Plaintiff's unsupported affidavit testimony regarding Mr. Ehrlich's should be considered at this stage of the proceedings.  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) ("To survive summary judgment, non-movant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.").  Notwithstanding this evidentiary issue, Plaintiff's allegations regarding Mr. Ehrlich are not sufficient to raise a genuine issue of material fact because there are at least three crucial distinctions between Plaintiff's and Mr. Ehrlich's experiences.  First, Plaintiff had a motive for submitting an adulterated sample based on his admitted drug use only three days prior

-12-

to his December 7, 2010 test.[2] In contrast, there is no evidence suggesting that Mr. Ehrlich had reason to submit an adulterated specimen.

Second, the results from Plaintiff's December 7, 2010 test stated that Plaintiff's specimen had "Abnormal Physical & Chemical Characteristics," which supports an inference of adulteration. In contrast, there is no evidence in the record as to what caused Mr. Ehrlich's initial test to produce invalid results. Thus, based on the evidence, one can only speculate as to whether Mr. Ehrlich's specimen possessed abnormalities similar to Plaintiff's or whether Mr. Ehrlich's invalid test was the result of less suspicious causes, such as some technical error in testing or handling his specimen.

Finally, at the Step 3 hearing, Plaintiff admitted, albeit equivocally, to adulterating his December 7, 2011 sample. Though Plaintiff now denies adulterating his sample and alleges that his admission was merely an attempt to appease a hostile Mr. Schwetje, these allegations do not completely negate the significance of his admission. The Union could have rationally concluded that an arbitrator would have found that Plaintiff's admission was valid or, alternatively, that Plaintiff's wavering testimony undermined his credibility. Based on the distinctions between Plaintiff's and Mr. Ehrlich's experiences, Plaintiff's allegations regarding Mr. Ehrlich are not sufficient to state a genuine issue of material fact.

For similar reasons, I find unavailing Plaintiff's remaining arguments regarding

---

[2] Plaintiff is correct to argue that his failure of the December 10, 2010 drug test did not constitute sufficient grounds for his termination and thus could not, by itself, justify his termination. Nonetheless, Plaintiff errs in that he fails to recognize the relevance of that result and his subsequent admissions to the issue of whether he had plan, motive, and intent to submit an adulterated specimen for the December 7, 2010 test.

Evraz's failure to investigate his invalid test result and its inability to prove misconduct. Again, Plaintiff not only used drugs three days before his December 7, 2010 test, he admitted, albeit equivocally, to adulterating his sample for that test.  These facts suggest that there was no need to further investigate the results of Plaintiff's December 7, 2010 test.

Of course, if this were a breach of contract case, it would be inappropriate for the court to draw these inferences against Plaintiff at the summary judgment stage.  Here, however, it is appropriate to recognize potentially weak aspects of Plaintiff's grievance to assess the rationality of the Union's decision not to pursue arbitration.  Plaintiff must show not only that his grievance was meritorious, but that it was so likely to succeed that the Union's refusal to pursue arbitration was irrational and, thus, arbitrary.  Based on the record as a whole, I find that Plaintiff has failed to present sufficient evidence that the Union acted arbitrarily in refusing to arbitrate his grievance.

> b.  Plaintiff's Claim that the Union Processed His Grievance in a Perfunctory Fashion

In addition to his claim that the Union arbitrarily refused to arbitrate his grievance, Plaintiff contends that the Union processed his grievance in a perfunctory fashion.  In his Response to Motion for Summary Judgment, Plaintiff raises only two allegations that are relevant to this issue.  First, Plaintiff alleges that Union representatives failed to object to Mr. Schwetje's hostile questioning at the Step 3 hearing.  (ECF No. 35 at 2-3 ¶ 26, 53.)  Second, Plaintiff alleges that Union representatives failed to communicate with him regarding his grievance until after the step 4 hearing.  (ECF No. 35 at 6 ¶ 55.)

Plaintiff cites no analogous cases in which a union's conduct was held to be perfunctory.  Rather, Plaintiff relies entirely on the readily distinguishable case of *Webb* as the only legal authority supporting his claim of perfunctory union conduct.  In *Webb*, a terminated union employee filed a hybrid claim against his employer and union after his grievance was denied.  155 F.3d at 1236-37.  The district court entered judgment for the defendants notwithstanding the jury verdict for the employee after the employee presented evidence that his union representative, *inter alia*, failed to present a viable retaliation claim on his behalf, failed to review the employer's evidence prior to hearing, and misled the employee by instructing him not to appear at an out of state hearing only to later tell the committee that the employee had independently chosen not to attend. *Id.* at 1240-41.  The Tenth Circuit reversed the district court, holding that the employee's evidence was sufficient to allow a jury to find that the union processed the grievance "in such a perfunctory, apathetic, indifferent, and cursory way that [it] breached its duty of fair representation."  *Id.* at 1240.

In contrast, here, the record conclusively shows that the Union gave Plaintiff's grievance more than just cursory attention.  At the outset, it is important to note that the Union obtained a hearing reviewing Plaintiff's termination despite Plaintiff's failure to timely file a grievance.  Thus, while Plaintiff complains of the Union's refusal to arbitrate and its lack of responsiveness to his correspondence following the Step 3 hearing, Plaintiff's grievance would not have been reviewed at all were it not for the Union's special efforts.  The Union not only conducted a Step 3 hearing on Plaintiff's behalf, but

appealed to Step 4.  Several Union representatives appeared on Plaintiff's behalf at both hearings, presenting multiple arguments in favor of Plaintiff's grievance.

In citing *Webb*, Plaintiff has not presented evidence that the Union was unprepared at his grievance hearings or that it failed to present entire claims on his behalf.  Rather, Plaintiff alleges only that union representatives ignored his correspondence and that they failed to object to Mr. Schwetje's hostile questioning at the Step 3 hearing.

Plaintiff's allegations are inadequate.  First, Plaintiff cites no authority, and I find none, suggesting that a union breaches its duty of fair representation when it fails to promptly respond to a union employee's requests for status updates on the employee's grievance.  Even assuming that Plaintiff's Union representatives failed to respond to Plaintiff's repeated emails in due course, such inconsequential neglect cannot ground a claim that the Union breached its duty of fair representation.  *See Menges v. ABF Freight System, Inc.*, 385 Fed. Appx. 814, 819-20 (10th Cir. 2010) (union employee's subjective opinion as to union's preparedness at grievance hearing insufficient to raise a fact issue as to the reasonableness of the union's representation).

Likewise, Plaintiff's contention regarding the Union's failure to object at the Step 3 hearing is not sufficient to sustain Plaintiff's claim.  Failure to present a particular legal argument is not sufficient to create an issue of material fact as to whether a union breached its duty of fair representation.  *Young*, 95 F.3d at 998.  Similarly, the Union's failure to object to Mr. Schwetje's questioning is not, by itself, sufficient to render the

Union's conduct perfunctory.

Thus, Plaintiff has failed to present sufficient evidence that the Union breached its duty of fair representation in processing his grievance, and thus, Plaintiff's hybrid claim cannot be sustained as a matter of law.  Having disposed of Plaintiff's claim on this issue, it is unnecessary to address whether Plaintiff has presented sufficient evidence to satisfy the remaining elements of his claim.

IV.    CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 26) is **GRANTED.**  Defendant is entitled to summary judgment in its favor as to Plaintiff's hybrid claim under the LMRA alleging breach of the collective bargaining agreement and of the Union's duty of fair representation.  Accordingly, this matter is **DISMISSED** in its entirety.

Dated:  December 20, 2012.

BY THE COURT:


s/ Wiley Y. Daniel
WILEY Y. DANIEL,
CHIEF UNITED STATES DISTRICT JUDGE